IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:19-cv-00567-M

WANDA WILSON and JIMMY WILSON,    )
                                  )
                    Plaintiffs,   )
                                  )          **OPINION**
v.                                )          **AND ORDER**
                                  )
C.R. BARD, INC.,                  )
                                  )
                    Defendant.    )

This matter comes before the Court on Defendant's Motion for Summary Judgment, filed August 14, 2019. [DE-45] For the reasons that follow, Defendant's motion is GRANTED.

## I.    Background

On December 2, 2007, Plaintiff Wanda Wilson ("Plaintiff"[1]) underwent a hysterectomy and oophorectomy and was surgically implanted with two pelvic-mesh devices manufactured by Defendant, the Align TO Urethral Support System (the "Align TO") and the Avaulta Plus Biosynthetic Support System (the "Avaulta Plus"). [DE-31 at 5; DE-53-1 at 31–32] Following her December 2007 surgery, Plaintiff complained of various issues to her physician, Dr. Aneesa Lewis, and Plaintiff underwent further surgery to adjust the placement of Defendant's devices on March 17, 2008. [DE-31 at 11] Both of these surgeries took place in Fayetteville, North Carolina. [DE-31 at 5, 11]

---

[1] Plaintiff Jimmy Wilson, Wanda Wilson's husband, is a consortium plaintiff whose claims are derivative of his wife's claims for injury under North Carolina law. *Sargent v. Edwards*, 2018 N.C. App. LEXIS 57, at *22 (N.C. Ct. App. Jan. 16, 2018) (unpublished) ("Loss of consortium is a derivative action . . . a spouse cannot recover for loss of consortium unless the action of the injured plaintiff is successful." (citations omitted)). Accordingly, the court will refer to Wanda Wilson as "Plaintiff" in this order for ease of reference, and will refer to Jimmy Wilson specifically where warranted.

1

Plaintiff filed this lawsuit on December 20, 2013 in the United States District Court for the Southern District of West Virginia [DE-1], where a multidistrict litigation concerning pelvic-mesh devices manufactured by Defendant and several other medical-device manufacturers was pending. *See In re C.R. Bard, Inc. Pelvic Repair Sys. Prods. Liab. Litig.*, MDL No. 2187 (S.D. W. Va.) ("MDL 2187"). Plaintiff initiated her lawsuit by filling out and filing a Short Form Complaint whose use had been approved by the judge presiding over the multidistrict litigation (the "MDL Court"), and which incorporated by reference a Master Long Form Complaint whose use had also been approved by the MDL Court. [DE-1 at 1, 70-3 at 2] Through these documents, Plaintiff has pled that she was injured by Defendant's devices, and seeks compensatory and punitive damages from Defendant under the following theories of liability: (1) negligence; (2) strict liability for design defect; (3) strict liability for manufacturing defect; (4) strict liability for failure to warn; (5) breach of express warranty; (6) breach of implied warranty; and (7) loss of consortium, which her husband Jimmy Wilson, the other plaintiff in this case, also claims. [DE-1 at 5, 70-3 at 5]

In October 2014, Plaintiff had a check-up with Dr. Lewis, and complained of having suffered from pain during sexual intercourse, also known as dyspareunia, since she resumed sexual activity following her hysterectomy, in 2008 at the latest. [DE-53-1 at 37] In February 2015, Dr. Lewis performed surgery on Plaintiff to remove eroded mesh. [DE-53-1 at 37–38]

In a June 2017 Plaintiff Profile Form and February 2019 Plaintiff Fact Sheet the MDL Court required that all plaintiffs in all cases in MDL 2187 submit under oath—and whose contents the MDL Court ordered would be considered as responses to interrogatories and requests for production under Federal Rules of Civil Procedure 33 and 34 [DE-70-5 at 209 (MDL 2187 Pretrial Order # 66)]—Plaintiff later specified that the "bodily injuries" she claims she suffered as a result of the implantation of Defendant's devices included: (1) urinary-retention issues; (2) bladder infections; (3) pain, including general pelvic pain and

2

dyspareunia; (4) bleeding; (5) weight loss; (6) financial hardship; (7) mental and physical fatigue; and (8) "surgery to address mesh erosion." [DE-18 at 2–3; DE-31 at 6]

Following the close of discovery, on August 14, 2019, Defendant moved for summary judgment under Federal Rule of Civil Procedure 56 ("Rule 56"). [DE-45] Defendant's summary-judgment motion was opposed by Plaintiff and had been fully briefed by the parties and remained pending when the MDL Court transferred the case to this court on December 17, 2019. [DE-60]

## II.    Legal standards

A party moving for summary judgment on a claim or defense bears the burden of "show[ing] that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law" on that claim or defense. Fed. R. Civ. P. 56(a). Within the meaning of Rule 56: (1) a fact is "material" if a jury's decision regarding the fact's existence or nonexistence "might affect the outcome of the suit under the governing law"; and (2) a dispute about a material fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which [the movant] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may demonstrate the absence of a genuine dispute as to a material fact by: (1) "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[,]" Fed. R. Civ. P. 56(c)(1)(A); or (2) showing that the record "do[es] not establish the absence or presence of a genuine dispute, or that [the nonmovant] cannot produce admissible evidence to support the fact[,]" Fed. R. Civ. P. 56(c)(1)(B). Where the nonmovant will bear the burden of

3

proof at trial on a dispositive issue, the movant may carry its burden on summary judgment by noting the absence of evidence in the record sufficient for the nonmovant to satisfy their burden of proof. *Celotex*, 477 U.S. at 324. Record evidence supporting a motion for summary judgment or an opposition thereto must be proffered in a form that is admissible, or the party must satisfactorily explain the admissible form in which the evidence would be admitted at trial. Fed. R. Civ. P. 56(c)(2); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538–39 (4th Cir. 2015).

The Fourth Circuit has said:

> When the moving party has carried its burden, the nonmoving party must come forward with evidence which shows more than some metaphysical doubt that genuine and material factual issues exist. A mere scintilla of evidence presented by the nonmoving party is insufficient to circumvent summary judgment. Rather, the nonmoving party must convince the court that upon the record taken as a whole[2] a rational trier of fact could find for the nonmoving party.

*Austin v. Clark Equip. Co.*, 48 F.3d 833, 836 (4th Cir. 1995) (internal quotation marks and citations omitted). Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and, pursuant to Rule 56(c), to "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). Regarding the court's duty in deciding whether a nonmovant has demonstrated the existence of genuine and material factual issues, the *Anderson* Court said:

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.

477 U.S. at 255. Or as the Fourth Circuit put it another way, the nonmovant is entitled "to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him[.]" *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.

---

[2] The court need only consider those parts of the record cited by the parties, but it may consider other materials in the record if it so chooses in the exercise of its discretion. Fed. R. Civ. P. 56(c)(3); *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 324–25 (4th Cir. 2017).

4

1979). However, evidence proffered by the nonmovant that is "merely colorable" or "not significantly probative" of the issues will not defeat an otherwise-meritorious motion for summary judgment. *Anderson*, 477 U.S. at 249–50; *see also Austin*, 48 F.3d at 836 ("A mere scintilla of evidence presented by the nonmoving party is insufficient to circumvent summary judgment."). Moreover, "it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 241 (4th Cir. 1982) (quotation marks and citation omitted).

In sum, where the district court concludes that—based upon the record taken as a whole, when viewed in the light most favorable to the nonmovant as described above—a reasonable jury could render a verdict in favor of the nonmovant, summary judgment must be denied. *Anderson*, 477 U.S. at 248. Where, in light of the same, the court concludes that a jury could not reasonably render a verdict in the nonmovant's favor, summary judgment may be granted. *Id.* at 249–50.

### III. Analysis

Defendant first argues that Plaintiff's claims are barred by the applicable statute of limitations under North Carolina law.

Because its determination is potentially fatal to Plaintiff's claims, the question of whether Plaintiff's claims were timely filed concerns a "material" fact within the meaning of Rule 56. *See Anderson*, 477 U.S. at 248. However, the question remains whether the dispute about this material fact is "genuine" within the meaning of Rule 56, i.e., whether the "evidence is such that a reasonable jury could return a verdict for [Plaintiff as the] the nonmoving party" on her claims in light of the materials in the record cited by the parties. *Id.*

A federal court sitting in diversity applies the substantive laws of the forum state, including the applicable statute of limitations under the forum state's choice-of-law rules. *Guar. Tr. Co. v. York*, 326

U.S. 99, 109–10 (1945). As a 28 U.S.C. § 1404(a) transferee court, the court must apply the choice-of-law rules of the transferor state: here, West Virginia [*see* DE-60]. *Ferens v. John Deere Co.*, 494 U.S. 516, 523 (1990) ("A transfer under § 1404(a) . . . does not change the law applicable to a diversity case."). Under West Virginia's choice-of-law rules, actions brought in tort are governed by the rule of *lex loci delicti*, which says that "'the law of the place of injury'" governs. *Kenney v. Indep. Order of Foresters*, 744 F.3d 901, 905, 908 (4th Cir. 2014) (quoting *West Virginia ex rel. Chemtall, Inc. v. Madden*, 216 W. Va. 443, 450–51, 607 S.E.2d 772, 779–80 (2004) (citation omitted)). Plaintiff alleges that her implantation surgeries took place in North Carolina [DE-31 at 5], and the parties agree that North Carolina law governs and that N.C. Gen. Stat. § 1-52(16) is the applicable statute of limitations in this case. [DE-46 at 3–5; DE-53 at 3]

"In North Carolina, the applicable statute of limitations for claims involving negligence for personal injury . . . is three years, which 'shall not accrue until bodily harm to the claimant . . . becomes apparent or ought reasonably to have become apparent to the claimant, whichever event first occurs.'" *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 643, 643 S.E.2d 28, 33 (2007) (quoting N.C. Gen. Stat. § 1-52(16)). Under North Carolina law, once a defendant raises the statute-of-limitations defense, the plaintiff bears the burden at trial of proving that its action was timely filed. *See Little v. Rose*, 285 N.C. 724, 727, 208 S.E.2d 666, 668 (1974). Plaintiff filed her Short Form Complaint on December 20, 2013. [DE-1] Accordingly, the question is whether Plaintiff can convince a reasonable jury that her "bodily harm[s]" had not become apparent to her, and would not have become apparent to a reasonable person in her position, before December 2010; if she cannot, Plaintiff's claims are barred by N.C. Gen. Stat. § 1-52(16).

The first question for the court's consideration is what the relevant "bodily harm[s]" are. Plaintiff's Profile Form and Fact Sheet contain assertions[3] that Plaintiff has suffered the following "bodily injuries as

---

[3] *See infra* note 6 (explaining why the contents of those documents are evidence, rather than mere allegations).

6

a result of the implantation of" Defendant's devices: (1) urinary-retention issues; (2) bladder infections; (3) pain, including general pelvic pain and dyspareunia; (4) bleeding; (5) weight loss; (6) "financial hardship"; (7) mental and physical fatigue; and (8) "surgery to address mesh erosion." [DE-18 at 2–3; DE-31 at 6] Two of these asserted injuries are not properly construed as "bodily harm[s]" within the meaning of N.C. Gen. Stat. § 1-52(16) as alleged. First, "financial hardship" plainly does not qualify. Second, where a plaintiff brings an action against a manufacturer alleging personal injuries caused by its product, surgery to address such harms does not constitute the relevant "bodily harm" within the meaning of N.C. Gen. Stat. § 1-52(16); instead, the "bodily harm" is the harm that led to the corrective surgery.[4] In her brief, Plaintiff does not argue that either the erosion of the mesh or the surgery to correct it were in themselves "bodily harm[s,]" but instead argues that the erosion "was a major contributor to [Plaintiff's] pain with sex[,]" i.e., dyspareunia, a different asserted injury which the surgery was intended to alleviate. [DE-53 at 5–6] The court will construe dyspareunia, along with Plaintiff's five other remaining asserted injuries, as "bodily harm[s]" within the meaning of N.C. Gen. Stat. § 1-52(16).[5]

---

[4] Where the alleged "bodily harm" is the surgery itself, the action is a medical-malpractice action that (1) must be brought against the physician who performed the surgery and (2) is subject to the limitations period described by N.C. Gen. Stat. § 1-15(c), rather than N.C. Gen. Stat. § 1-52(16). *See* N.C. Gen. Stat. § 1-52(16) (specifically noting that it does not apply to "causes of actions referred to in [N.C. Gen. Stat. §] 1-15(c)"); *Watts v. Cumberland Cty. Hosp. Sys., Inc.*, 75 N.C. App. 1, 12, 330 S.E.2d 242, 250 (1985) ("Since plaintiff's claim is one for malpractice arising out of the performance of professional services, the applicable statute is [N.C. Gen. Stat. §] 1-15(c) rather than [N.C. Gen. Stat. §] 1-52 as [the defendant] alleges."), *rev'd on other grounds*, 317 N.C. 321, 345 S.E.2d 201 (1986).

[5] Plaintiff characterizes certain conditions she allegedly experienced—including urinary retention, pain, and fatigue—as "bodily injuries[.]" [DE-31 at 6] These conditions are perhaps more reasonably construed as symptoms indicating the existence of "bodily harm[s]" rather than "bodily harm[s]" themselves. *See Wooten v. Warren by Gilmer*, 117 N.C. App. 350, 355, 451 S.E.2d 342, 346 (1994) (listing the plaintiff's "complaints and symptoms" resulting from neck and back injury as including "severe neck pain" and "fatigue and lethargy"). Plaintiff does not take the position that these alleged conditions were indicia of any other "bodily harm[s,]" but instead alleges in her complaint (and argues in her brief) that the conditions are among the "bodily injuries" for which she seeks recompense. [DE-31 at 5–6]

Such conditions can themselves be compensable as damages in tort. *See Iadanza v. Harper*, 169 N.C. App. 776, 779, 611 S.E.2d 217, 221 (2005) (tort damages may "include such matters as mental or physical pain

Defendant argues that the evidence shows that: (1) Plaintiff experienced all of her asserted bodily harms except dyspareunia soon following the December 2007 implantation of Defendant's devices, which harms were the collective impetus for her March 2008 surgery; and (2) Plaintiff began experiencing dyspareunia sometime in 2008. [DE-46 at 4–8] In support, Defendant primarily cites to Plaintiff's own deposition testimony. [DE-46 at 4–8]

First, Plaintiff testified to suffering from urinary-retention issues starting "right away from the surgery" in December 2007 when she was implanted with Defendant's devices. [DE-45-6 at 9] Second, Plaintiff also testified to having infections immediately following the December 2007 surgery. [DE-45-6 at 9] Plaintiff's testimony is corroborated by that of Dr. Lewis, Plaintiff's physician, who testified that Plaintiff was suffering from dysuria and urinary infections at a February 2008 consultation. [DE-45-2 at 47–48] Third, Plaintiff testified that she has experienced vaginal pain "the whole time" [DE-45-6 at 13–15], and has suffered from dyspareunia since Dr. Lewis cleared her to resume sexual activity in 2008 following the implantation of Defendant's devices. [DE-45-6 at 25–27; DE-45-2 at 52–53] That testimony is consistent with Plaintiff's expert's report, which says that Plaintiff "complain[ed] of painful intercourse since she had her hysterectomy" during her October 2014 check-up with Dr. Lewis. [DE-53-1 at 37] Fourth, Plaintiff testified that she suffered from "heavy bleeding" before the December 2007 surgery, and has experienced bleeding following sexual intercourse since 2008. [DE-45-6 at 25–26, 41, 48] Fifth,

---

and suffering, inconvenience, or loss of enjoyment" (citation omitted)). And even if not considered "bodily harm[s]" themselves, such conditions provide the person experiencing them with the notice (actual or inquiry) that "bodily harm" exists that starts the clock under N.C. Gen. Stat. § 1-52(16).

This court will not construe Plaintiff's conditions as harms for the purpose of establishing a right to relief, but not as harms for statute-of-limitations purposes. Such a construction would make little sense, particularly where Plaintiff has not specified another harm upon which the analysis might focus. The court will accordingly construe each of the six remaining asserted injuries listed above as the relevant "bodily harm[s]" for purposes of its statute-of-limitations analysis.

Plaintiff testified that the weight loss asserted in her Fact Sheet occurred in 2008. [DE-45-6 at 31] And finally, Plaintiff testified that the fatigue she suffered happened soon following the December 2007 surgery, when she was "bedridden[.]" [DE-45-6 at 31] Plaintiff's testimony is largely corroborated by her Fact Sheet, also cited by Defendant, in which Plaintiff claimed her "bodily injuries" resulting from Defendant's devices were as follows:

> The sling was too tight. I was unable to empty my bladder causing infections and pain to the point of forcing me to bed rest. Mentally I felt like there was something seriously wrong. I lost 14 lbs. in 7 days. Not being able to return to work was causing financial hardship form [sic] lost income; drained me physically and mentally. Later on, I had pain and had to have another surgery to address mesh erosion.

[DE-31 at 6; *see* DE-45-6 at 67–68, 72–74 (Plaintiff testimony that she suffered because of sling tightness "leading up" to the March 2008 surgery, at which the sling was "loosened")] By raising the statute-of-limitations defense and directing the court's attention to this admissible record evidence, Defendant has carried its burden within the meaning of *Celotex* and *Austin*. The question therefore becomes whether Plaintiff has forecast evidence of her own sufficient to "convince the court that upon the record taken as a whole a rational trier of fact could find" in Plaintiff's favor in spite of the evidence cited by Defendant. *Austin*, 48 F.3d at 836.

Plaintiff makes two arguments in opposition. First, Plaintiff argues that she has introduced evidence that it was not until 2012 when she "first became aware [that her] injuries were due to the mesh products[.]" [DE-53 at 5] In support of this argument, Plaintiff cites to her Fact Sheet,[6] in which she asserted that she

---

[6] Although in making its showing a nonmovant may not rest on its pleading and must "come forward with *evidence*" demonstrating a genuine dispute as to a material fact, *Austin*, 48 F.3d at 836 (emphasis added), because the MDL Court (1) required that Plaintiff execute her Profile Form and Fact Sheet and submit them under oath and (2) ordered that the assertions contained therein would be considered as responses to interrogatories and requests for production under Federal Rules of Civil Procedure 33 and 34 [*see* DE-70-5 at 209 (MDL 2187 Pretrial Order # 66)], the assertions within Plaintiff's Profile Form and Fact Sheet are properly considered as evidence and not the mere allegations of her pleading for purposes of the court's analysis. *See* Fed. R. Civ. P. 56(c)(1)(A) ("interrogatory answers" properly support Rule 56 motions).

"first attribute[d her] bodily injuries to the pelvic mesh products" in 2012 [DE-31 at 6], which is when she testified that she saw a television commercial "talking about some of the symptoms" which made her think "that's probably what [her] problems [we]re coming from." [DE-45-6 at 88]

However, North Carolina's discovery rule only tolls the three-year statute of limitations applicable to Plaintiff's claims "until bodily harm to the claimant . . . becomes apparent or ought reasonably to have become apparent to the claimant[.]" N.C. Gen. Stat. § 1-52(16). Thus, under the plain terms of N.C. Gen. Stat. § 1-52(16), it is the appearance of the "bodily harm"—rather than Plaintiff's attribution of that harm's cause—that starts the clock. *See Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 493, 329 S.E.2d 350, 354 (1985) ("as soon as *the injury* becomes apparent to the claimant or should reasonably become apparent, the cause of action is complete and the limitation period begins to run." (emphasis added)). The question of when Plaintiff attributed her injuries to Defendant's devices is therefore not a material fact, and does not require trial.

Second, Plaintiff now argues that the March 2008 procedure was specific to the Align TO device, and that injuries resulting from the Avaulta Plus device were distinct from injuries resulting from the Align TO device and did not become apparent until the mesh erosion was discovered by Dr. Lewis. [DE-53 at 5–6] In support, Plaintiff cites to: (1) her Fact Sheet, where she asserted that "[l]ater on" after the March 2008 surgery she experienced "pain and had to have another surgery to address mesh erosion[,]" [DE-31 at 6]; (2) Defendant's expert's report, in which the expert opined that "[t]he second complication [Plaintiff] experienced was a vaginal mesh exposure alleged to have caused pain for herself and husband" which "did not present until February 2015[,]" [DE-53-3 at 59]; and (3) Plaintiff's expert's report, which she says states that "the first time [Plainitff] presented to a physician with symptoms of painful intercourse due to the Avaulta mesh exposure was October 9, 2014, which was after the filing of the lawsuit[,]" [DE-53-1 at 37]. [DE-53 at 5–6]

This argument also fails to defeat summary judgment. As a threshold matter, neither Plaintiff's Short Form Complaint, the Master Long Form Complaint, Plaintiff's Profile Form, nor Plaintiff's Fact Sheet contains any allegations regarding design features specific to the Align TO device or Avaulta Plus device. The two devices are included within the Master Long Form Complaint's communal definitions of "Pelvic Mesh Products" or "Products[,]" defined terms whose features are themselves alleged communally, and which therefore only allege features shared by both devices. [DE-70-3 at 5 (Master Long Form Complaint ¶¶ 9, 10, 12, 44) ] Beyond the bodily harms allegedly caused by the communally-attributed design features, the Master Long Form Complaint alleges only that the polypropylene mesh used in constructing the Pelvic Mesh Products was improper to implant into the human body. [DE-70-3 at 5 (Master Long Form Complaint ¶ 20)] However, the parties' experts both state that the two devices are both made from polypropylene mesh [DE-53-3 at 10; DE-53-1 at 7, 11], and Plaintiff concedes in her brief that "[t]he Avaulta Plus and Align TO products are made from the same material[.]" [DE-53 at 15] Finally, Plaintiff's unspecific assertion in her Fact Sheet that she suffered bodily injuries discrete to "the sling" and "the other mesh products" at different times is insufficient because no discrete injury is specifically attributed to either device individually. [*see* DE-31 at 6–7] Because Plaintiff has failed to allege (1) distinct design features of the individual devices or (2) discrete injuries caused by only one of the two devices, Plaintiff has not adequately alleged any discrete "bodily harm[s,]" and Defendant was accordingly given no reason to mount any defense regarding the same.

But even were discrete harms fairly in play, Plaintiff argues that only one "bodily harm" was discretely caused by the Avaulta Plus device in her brief: dyspareunia. [DE-53 at 5–6] Plaintiff's attribution is consistent with both her own testimony and Dr. Lewis's testimony that dyspareunia was the impetus of Plaintiff's 2015 surgery to excise parts of the Avaulta Plus device. [DE-45-6 at 76–78; DE-45-2 at 55–59, 63] And even assuming *arguendo* that Plaintiff's dyspareunia resulted from the Avaulta Plus device alone,

Plaintiff testified that she has suffered from dyspareunia since 2008. [DE-45-6 at 25] The fact that she may not have told Dr. Lewis about her dyspareunia and received a mesh-erosion diagnosis until much later is not material, because N.C. Gen. Stat. § 1-52(16) is concerned with when "bodily harm to the claimant . . . becomes apparent or ought reasonably to have become apparent *to the claimant*[,]" not to the claimant's physician. N.C. Gen. Stat. § 1-52(16) (emphasis added). Under North Carolina law, then, Plaintiff was required to exercise due diligence to ascertain her dyspareunia's cause, and to file suit within three years of the date when the dyspareunia became apparent or reasonably ought to have become apparent *to her*.[7] Accordingly, even under Plaintiff's Avaulta-Plus-discrete-harm theory, Plaintiff's statute-of-limitations clock began to run in 2008 when she experienced the harm that the Avaulta Plus device allegedly caused, and any subsequent dyspareunia was merely "aggravation of the original injury" that was insufficient to restart the clock. *Pembee*, 313 N.C. at 493, 329 S.E.2d at 354 ("It does not matter that further damage could occur; such further damage is only aggravation of the original injury.").

It is possible that Plaintiff's claim might have survived the N.C. Gen. Stat. § 1-52(16) defense at this juncture had different theories been argued and different evidence forecast by Plaintiff. As the nonmovant on summary judgment, Plaintiff gets the "credibility of [her] evidence as forecast assumed, [her] version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to [her.]" *Charbonnages*, 597 F.2d at 414. However, Plaintiff bears the burdens of arguing a viable theory of liability and demonstrating to the court through a forecast of evidence that a genuine dispute as to a fact material to that theory within the meaning of *Anderson* exists. The harm alleged, the alleged cause of the harm, and when the harm allegedly manifested itself are such material facts, but Plaintiff's arguments and forecast of evidence determine whether a dispute regarding such facts is genuine such that a trial is necessary. Where

---

[7] The fact that Plaintiff filed her Short Form Complaint seeking damages for dyspareunia in 2013 makes particularly clear that her physician-presentation argument—by which she seeks to establish that the dyspareunia "bec[ame] apparent or ought reasonably to have become apparent to" her on dates in 2014 and 2015 that *follow* the date she alleged that Defendant's devices caused her dyspareunia—must be rejected.

after reviewing the nonmovant's forecast the court must consider theories of liability that were not argued and imagine evidence not forecast, the nonmovant has failed to demonstrate a genuine dispute as to a material fact and summary judgment in the movant's favor is appropriate. *See Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (noting that, even in *pro se* context, district courts are "not require[d] . . . to conjure up questions never squarely presented to them" or "to anticipate all arguments that clever counsel may present in some appellate future. To do so would not only strain judicial resources by requiring those courts to explore exhaustively all potential claims of a . . . plaintiff, but would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.").

In sum, because (1) the record evidence cited by the parties—viewed with the "credibility of [Plaintiff's] evidence as forecast assumed, [her] version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to [her,]" *Charbonnages*, 597 F.2d at 414—demonstrates that the bodily harms that form the basis of Plaintiff's personal-injury claims all became apparent to her by 2008, and (2) Plaintiff did not file her claims until 2013, Plaintiff has failed to forecast evidence sufficient to "convince the court that upon the record taken as a whole a rational trier of fact could find" that North Carolina's three-year statute-of-limitations period had not expired before Plaintiff filed her complaint. *Austin*, 48 F.3d at 836; *see Shearin v. Lloyd*, 246 N.C. 363, 370, 98 S.E.2d 508, 514 (1957) ("Statutes of limitations are inflexible and unyielding. They operate inexorably without reference to the merits of plaintiff's cause of action."). Accordingly, the court concludes that Defendant's motion for summary judgment should be granted and that Plaintiff's claims should be dismissed as untimely.

Because the court so concludes, the court has no occasion to address the remainder of the parties' arguments.

## IV.    Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED and the action is DISMISSED. The court's decision renders MOOT: (1) Plaintiffs' Motion to Exclude Certain Opinions and Testimony of Defense Expert Matthew Clark, M.D., filed August 15, 2019 [DE-47]; (2) Defendant's Motion to Strike Plaintiffs' Rule 26 Expert Supplemental Report of Michael Thomas Margolis, M.D., filed August 15, 2019 [DE-49]; and (3) Defendant's Motion to Limit or Exclude Certain Opinions and Testimony of Michael T. Margolis, M.D., filed August 15, 2019 [DE-51].

SO ORDERED this the 21st day of May, 2020.

RICHARD E. MYERS II
UNITED STATES DISTRICT JUDGE